UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

PAMELA JEAN FORTON and LINWOOD
EUGENE MUNSELL as joint personal
representatives of Estate of TRACY
WALSH, Deceased,

                Plaintiffs,                    Case Number 05-10066-BC
                                                Honorable David M. Lawson

v.

COUNTY OF OGEMAW, SHERIFF
HOWIE S. HANFT, BONNIE McCORMACK,
GARY COWDREY, VINCE TOMASSI,
BRIAN GILBERT, STEVE PIZZALA,
KEN TEMPLE, DAMON SUITER,
DONALD SHELTROWN, and KEVIN  SCOTT,

                Defendants.
_____/

**OPINION AND ORDER GRANTING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT**

On November 20, 2004, Tracy Walsh died while she was in the custody of the Ogemaw

County, Michigan sheriff.  She suffered from a malignant tumor in her neck, which apparently grew

rapidly and constricted her aorta, esophagus, and trachea, causing her eventually to suffocate.  She

suffered symptoms from this insidious growth, which, the plaintiffs insist, should have impelled the

defendants – Walsh's jailors and their medical attendants – to take more aggressive action than they

actually performed to address this fatal condition.  The plaintiffs contend that the defendants' lapses

and failures amounted to deliberate indifference to Ms. Walsh's serious medical needs in violation

of the Eighth Amendment.  However, the Court concludes that the undisputed facts viewed in the

light most favorable to the plaintiffs fail to establish the necessary mental state on the part of the

defendants consistent with an Eight Amendment claim. The Court, therefore, is constrained to grant the motions for summary judgment on the part of all the defendants.

I.

On September 22, 2004, Tracy Walsh began serving an eleven-month sentence for drunk driving at the Ogemaw County, Michigan jail. There is no evidence in the record as to the onset date of the upper mediastinal tumor that encircled her cervical organs, but it is undisputed that the tumor remained undiagnosed until after her death.

Ms. Walsh suffered from alcoholism, severe depression, panic attacks, and major depression. In 2004, she lived with her boyfriend, Robert Tuljus, who similarly was afflicted with alcoholism. At some point in 2004, although not specified in the record, Walsh was convicted of drunk driving. Eventually she was ordered to spend eleven months in the Ogemaw County jail, but not before she was arrested at the scene of a domestic disturbance on September 22, 2004, where the police discovered that Walsh was wanted in court for sentencing.

When Walsh was booked into the Ogemaw County jail, she had a blood alcohol level of .28 and apparently was unable to answer questions. According to Ogemaw County Sheriff Howie Hanft, Walsh's inebriation at the time of booking meant that Walsh's initial health screening and booking paperwork were incomplete. Hanft testified that the jail houses approximately forty inmates and employs nine full-time and four part-time corrections officers. Health care was provided by contract with Bonnie McCormack, LPN, who acted a jail nurse, and physician's assistant Brian MacAuley, who assisted and supervised her.

McCormack was on site approximately fifteen hours per week on Wednesdays and Thursdays and was available day or night on an on-call basis. MacAuley visited the jail once per

-2-

week and similarly was on-call "24/7" for basic medical services.  Def.s' Mot. Summ. J. Ex. O,

MacAuley dep. at 10, 14.  MacAuley was supervised by Dr. Michael Beasley, who worked at the

Evergreen Clinic.

       In addition, according to the defendants, corrections officers receive basic medical training,

including how to respond to emergencies and when to refer inmates to medical professionals.

Defendant Brian Gilbert explained at his deposition that in order to become a certified corrections

officer, he attended a "160-hour correctional academy." Def.s' Mot.  Summ. J. Ex. A, Gilbert dep.

at 7.  Among other topics, the certification included classes on "how to react in emergency situations

when inmates have medical problems," and "CPR and how to get more qualified personnel to the

scene."  *Ibid.*  The officers also were instructed to turn to McCormack when inmates had medical

complaints.  *Ibid.*

       On September 23, 2004, McCormack performed an initial evaluation of Walsh at the request

of the jail staff.  McCormack explained at her deposition:

> Q.     How did you first come in contact with her?
> A.     The staff asked me to evaluate her when she was booked in on 9/23/04.
> Q.     And did you evaluate her on September 23, 2004?
> A.     Yes.
> . . .
> Q.     On September 23, 2004 what concerns or health concerns did Ms. Walsh
>         relate to you that she was having?
> A.     She had bruising.  She was involved in a domestic violence situation.  She
>         was intoxicated.  She had bruising on her face – her left eye, her lip.  I did a
>         complete evaluation – nursing evaluation as far as bruising, but what I could
>         see was facial bruising.

McCormack dep. at 29-30.  McCormack summarized her findings in a report.

> Booked last night with a PBT of .28.  Slept all night.  Today was examined by me.
> Bruising around the left eye an lower left lip.  Upper lip swollen cuts noted inside
> upper lip. Pupils equal and reactive. Denies complaints except some facial pain.  Has

meds Paxil and Seraquel at Roo's Pharmacy. Has someone who will be bringing them in and refilling them for her 11-month stay here. Needs to attend AA.

*Id.* at 32.

In accordance with the jail's policy, McCormack performed a fourteen-day evaluation of Walsh on October 20, 2004. The evaluation form noted that the plaintiff was taking "visteral, seriquel, paxil," and she was a non-smoker and drank "2 cups of coffee a day." Def.s' Mot. Summ. J. Ex. 6, Fourteen-Day Eval. In addition, next to the "swelling on neck" portion of the form, McCormack circled "yes." *Ibid.* The form indicated that Walsh also had "gastrointestinal" problems. *Ibid.*

On November 8, 2004, Walsh filled out a request for medical services. She stated that "something is wrong with my neck. It hurts badly and I can barely move my neck. Swollen really bad." Def.s' Mot. Summ. J. Ex. H., Medical Request. Walsh also wrote that the condition had begun "about 4 days ago. It get[s] worse every day. Can't sleep at night." *Ibid.* McCormack saw Walsh two days later. She examined Walsh's neck and found "there was a slight swelling in her neck/shoulder area." McCormack dep. at 37. As a result, McCormack arranged for Walsh to see physician assistant MacAuley the following day.

MacAuley examined Walsh as arranged. He noted that Walsh "was complaining of a swelling on the left side of her neck. I palpated it, and it felt the consistency of a water balloon." MacAuley dep. at 17. MacAuley admitted that he "had never seen this before" and consequently "chose to refer her to Evergreen Clinic for further evaluation." *Ibid.* Walsh was seen at the Evergreen Clinic within a few hours. There, Dr. Beasley examined her. At his deposition, Beasley testified that "[i]nitially, I couldn't see anything" but after "looking at her neck, palpating it, having her strain . . . and palpating it while she was straining," he concluded "there was an increased

fluctuance in the soft tissue area, and that might mean there was a mass underlying that area." Def.s'

Mot. Summ. J.  Ex. S, Beasley dep. at 7.

Dr. Beasley explained that he did not order X-rays because "if there was something there,

most likely it wouldn't show up on an x-ray; so the definitive imaging procedure would be a CAT

scan[.]" *Id.* at 8.  He instructed his staff to set up the diagnostic test, but believed the matter was non-

emergent.

> Q.    And did you put any time frame on when the CAT should be performed?
> A.    No.
> Q.    And why not?
> A.    I would consider it a routine CAT scan.
> Q.    When you observed Ms. Walsh, was she in any discomfort?
> A.    No.
> Q.    Was she having any difficulty breathing?
> A.    No.

*Id.* at 8-9.  The exam was scheduled for November 23, 2004.

On November 16, 2004, Walsh again was seen at the Evergreen Clinic, but this time by

physician assistant Amy Green.  Apparently, Walsh had "difficulty breathing  in the morning due

to mucous drainage; feels occasional tightening in throat; mass on neck still painful; no changes."

 MacAuley dep. at 28.  However, there were "no fevers, no nausea or vomiting . . . .  Negative sore

throat." *Ibid.*  The jail staff responded to Walsh's condition by transporting her to the clinic. Green

described Walsh as a

> 34 year old female, no acute distress, alert and oriented times three.
> . . .
> Ears: Tms, clear, good cone of light bilaterally. . . nose, positive, white drainage,
> right septum.  Oral, positive moist mucosa.  No lesions.  No erythema. . . . neck,
> positive left-sided supraclavicular mass, fluctuant.  Approximate size, five
> centimeters by five centimeters.  No erythema.  No lesions.  No warmth.  Positive
> tender to palpation.

*Id.* at 29.  Green diagnosed an upper respiratory infection.  She prescribed "Avelox, 400 milligrams, one daily times 10 days . . . . Motrin, 800 milligrams, one P.O. q. six hours p.r.n. pain. . . . Depo-Medrol, 40 milligrams IM times one.  Albuterol metered dose inhaler, two puffs q. for to six hours p.r.n. wheezing." *Ibid.*  Finally, Green noted that a "CT scheduled for next week, await result." *Ibid.* Walsh was returned to the jail.

The next day, November 17, 2004, at around 11 p.m., McCormack was paged by corrections officer Ken Temple.  According to McCormack, Walsh told Temple that "she was saying that she was having difficulty breathing.  I asked him to put her on the phone and see if I couldn't figure out from her complaint what was going on with her."  McCormack dep. at 42.  McCormack claimed that Walsh "sounded fine . . . she was breathing fine.  She had a conversation with me" for a few minutes. *Ibid.*

Officer Temple again paged McCormack on November 18, 2004.  Temple told McCormack that Walsh was "anxious and she wanted to talk and she was having some problems in the cell." *Id.* at 43.  Walsh "said that she was claustrophobic." *Ibid.*  McCormack testified:

> Q.    Okay.  Did she indicate anything to you on the 18th of November, 2004, that
>       she was having any pain?
> A.    No.
> Q.    Okay.
> A.    She said she felt better.
> Q.    Did she say she was having shortness of breath?
> A.    She did.
> Q.    Did she say anything about how her neck felt?
> A.    She said the swelling had gone down.
> Q.    Did you examine her neck?
> A.    Yes, I did.
> Q.    Had in fact the swelling gone down?
> A.    Yes.

*Id.* at 44.  McCormack recorded the following in her notes on November 18, 2004:

> Nurse paged last night. This is regarding difficulty breathing. I talked to patient on the phone. She spoke clearly without difficulty that I could hear. I picked up an inhaler today. Staff states she is having aggressive episodes and requests Bev from AuSable Valley to be called. I called her. She said to place her in observation if in danger of hurting herself or others. She will check on status of next MD visit with Dr. Nathan. Per patient, she is claustrophobic.
> . . .
> [2:45 p.m] Albuterol offered, two puffs. I sat with patient in observation, instructed her on use of the Albuterol. She said that she did not want to return to cell. Stated that inhaler did not help her. She said she felt the swelling on left side of neck was smaller.

*Id.* at 45.

On November 19, 2004, Shirley Butson, a friend of Walsh's, was contacted by one of Walsh's cellmates, who apparently was concerned about Walsh's condition. Butson testified, however, that "I don't remember anything she even said to me." Pl.s' Resp. Br. Ex. 12, Butson dep. at 22. Although Butson did not remember what the inmate said, she memorialized the conversation in a letter to the jail, which she wrote on November 25, 2004.

> On Friday, November 19th a cellmate of Tracy Walsh called my house and talked to Robert Tuljus because she (Tracy) was too sick to make the call herself. Robert was told that Tracy's neck was swelled real bad, she was having trouble breathing and she felt so sick she couldn't even get out of bed and she wanted someone to help her. She didn't seem to be getting proper medical attention according to what Tracy said. Because of the phone call above, I got so upset that I called the jail myself and talked to one of the . . . officers about Tracy. I do not remember his name. I told him about Tracy's cellmate calling. . . . [I] ask[ed] what they were doing to help her, that they need to do something soon for her, because it didn't seem like they were doing enough for [her] as sick as she was. The corrections officer told me that a doctor had seen Tracy three days ago. . . . I ask[ed] what did he do for her. The officer didn't say much except that he'll transfer my call to the jail administrator. . . . So my call was transferred to talk to Gary Coudrie but had to leave a message since he didn't answer the phone.

Pl.s' Resp. Br. Ex. 24, Letter (Nov. 25, 2004).

During this general time period – between November 16 and 20, 2004 according to the plaintiffs – Delores Shaw, an inmate at the jail, observed Walsh. Shaw testified at her deposition

that Walsh's "neck was swelled and black and blue" and her breathing was "not well at all." Pl.s'

Resp. Br. Ex. 13, Shaw dep. at 15.  When Walsh returned from the Evergreen Clinic on November

16, 2004, Shaw stated that "I started taking care of her.  She was asking me to be in the room with

her, because she felt safe with me around.  I started then rubbing her with a cold rag." *Id.* at 16.

Shaw speculated that if she were the nurse, "I would take her over to the hospital and have her

admitted for further testing." *Id.* at 15.  Shaw also explained that the lump on Walsh's neck was

visible, "about three inches oblong." *Id.* at 59.

On November 20, 2004, at around 5:00 a.m., Walsh began pounding on the cell wall.

According to corrections officer Vincent Tomassi, on duty at the time, he responded and found

Walsh "standing at the door." Def.s' Mot. Summ. J. Ex. J, Tomassi dep. at 12.  Walsh indicated that

"she wasn't breathing very well." *Ibid.*  Tomassi related the following at his deposition:

> Q.    Okay, what did you do . . . ?
> A.    I told her that I would get right with her, that I would go call the nurse.  I had
>        talked to Nurse Bonnie, and she told me just go ahead and give her her
>        daytime meds because it was getting close to that time anyway and then give
>        her her inhalers.
> Q.    And did you have any other conversation with Nurse Bonnie?
> A.    Yes.  She told me that if she didn't feel any better, just to take her to the
>        observation cell just to keep a closer eye on her.

*Ibid.*  According to Tomassi, Walsh was "just breathing kind of heavy." *Id.* at 13.  Tomassi gave

Walsh the inhaler and noted that "she wasn't using them correctly," a fact which he related to

McCormack during their conversation. *Id.* at 19.  Apparently, McCormack told Tomassi that if

Walsh "turns blue or passes out to take her to the hospital." *Id.* at 15.  Tomassi testified that he

understood this statement to mean he was to take Walsh to the hospital if her condition deteriorated.

*Id.* at 42.

-8-

Officer Tomassi stated that he moved Walsh into the detox unit and checked on her "about 15 minutes later." *Id.* at 20. She seemed to Tomassi "to be a little better." *Ibid.* Tomassi was "in and out of there pretty frequent" in checking up on Walsh. *Ibid.* He further explained that he had no knowledge of Walsh's medical history including the fact that she had swelling in her neck. *Id.* at 12.

Tomassi also memorialized his observations in the jail log.

| | | |
|---|---|---|
| 11/20/04 | 05:10 | MEDS TO INMATE WALSH |
| . . . | | |
| 11/20/04 | 05:30 | TX TO NURSE BONNIE REF INMATE WALSHS BREATHING. ADVISED BY NURSE TO MOVE WALSH TO DETOX FOR OBSERVATION. IF SHE TURNS BLUE OR PASSES OUT TO TAKE TO HOSPITAL |

Pl.s' Resp. Br. Ex. 10, Jail log.

Inmate Shaw recalled events somewhat differently at her deposition. When Tomassi responded to Walsh's banging, Shaw testified that Walsh asked to go to the hospital, and that after Tomassi spoke with McCormack, he returned sometime later and told Walsh that the nurse had not approved a hospital visit. Shaw dep. at 64. Shaw stated that Walsh was feverish, her skin was clammy, and her "nailbeds were changing" color. *Id.* at 65. Shaw also claimed that Tomassi and another corrections officer stated "[u]nless it's a life or death situation, don't bother us." *Id.* at 66. Apparently, Tomassi "threw her a brown paper bag and stated it was all in her head." *Ibid.* However, Shaw also confirms that Tomassi provided Walsh the prescribed inhaler in response to her complaints of breathing problems. *Id.* at 25.

At approximately 6:00 a.m., corrections officer Steven Pizzala began his shift. He testified that Tomassi briefed him on the situation with Walsh when he arrived. Tomassi explained to Pizzala that Walsh was "in the tank . . . she was brought up there for observation." Def.s' Mot. Summ. J. Ex.

M, Pizzala dep. at 10.  Tomassi also said "[s]omething to the effect that she'll be all right.  She had

– everything that was being done was supposed to be done." *Ibid.*  At about the time Pizzala arrived,

Walsh began to scream.

> Q.      And when you got there, you noticed her screaming and banging against the
>          door?
> A.      Yes.
> Q.      And in fact, she was screaming I'm going to die.  Correct?
> A.      Yes.  That was the first thing.  When I walked though the door, that's what
>          I heard.
> . . .
> Q.      Did you have any conversation with her?
> A.      She said that – I asked her what was going on, and she said that she was – she
>          just wanted to be out of the cell, I remember that.   I said you're
>          hyperventilating.   You need to relax.   You need to calm down. . . . I
>          remember trying to calm her.

*Id.* at 11.  Shaw testified that other inmates heard Walsh screaming for help while in the observation

cell.  Shaw dep. at 67.

At 8:00 a.m., corrections officer Brian Gilbert began his shift.  Tomassi briefed Gilbert as

to Walsh's situation on his way out.  Gilbert dep. at 11.  Gilbert testified at his deposition as to the

conversation he had with Tomassi:

> Q.      What did C.O. Tomassi tell you?
> A.      He said that she was in the tank for medical problems so we could keep an
>          eye on her.
> Q.      Did he tell you the nature of those problems?
> A.      I do believe so.
> . . .
> Q.      Let me ask you this.  Did he tell you that she was having difficulty breathing?
> A.      I'm sure he did.
> Q.      Did he tell you that she was having chest pains?
> A.       I think he said chest pains.
> . . .
> Q .     . . . Are there any other complaints . . . that Ms.  Walsh said she was having?
> A.      . . . Well, she had a few complaints, like she didn't like to be in the cell, stuff
>          like that.

*Id.* at 11-12.

After being briefed by Tomassi, Gilbert stated that he "went up there [to the tank] quite a few times to talk to her." *Id.* at 13.  At 8:40 a.m., Gilbert went to Walsh's cell and "talked to inmate Walsh, and she stated she can breathe just fine and she wanted to be moved back into the female block." *Ibid.*  However, at 9:10 a.m., Gilbert testified that "Walsh was yelling in the detox," although he could not recall what she said.  *Ibid.*

Gilbert again checked on Walsh at 10:15 a.m.  According to Gilbert, Walsh told him that "she still wanted to be moved out of the tank."  *Id.* at 14.  Gilbert responded that "if she would just try to relax, we would try to move her during lunch time or something." *Ibid.*  Gilbert testified that he knew Walsh needed to calm down because "[s]he was rocking back and forth." *Ibid.*

Pizzala testified at his deposition that he monitored Walsh by the closed-circuit television system set up for the observation cell, but that Gilbert had taken the lead in dealing personally with Walsh.  He stated, however, that he had visited Walsh around lunch time: "I had asked her to try and eat her lunch, and I made a bargain with her.  I told her that – which we do a lot – if she ate her lunch, because she had calmed down quite a bit, that I'll move her to the back." Pizzala dep. at 15.  Pizzala related that Walsh

> didn't touch [her lunch].  It looked like a little sip of, or juice, or whatever that was on the tray, that at the time she had sipped maybe a little bit of it . . . . I remember her drinking something, but she didn't eat.  And I was kind of concerned because she should eat, but she said she was not hungry.
> . . .
> I told her – I said that when I come pick the tray up then we'll see about putting you in the back.  When I went back, I noticed the tray wasn't really touched.  I picked up the tray, and I don't know if I did it right after I picked up the tray or whatever.  Then I went ahead and I told her, I said are you ready to go back, and she said yes.

*Id.* at 15-16.

Pizzala continued that when Walsh stood up to go back to the female cell block, "she . . . seemed a little unbalanced.  I said are you sure you want to go in the back.  That's all she wanted to do.  She just wanted to go back and lay down." *Id.* at 16.

Walsh died shortly thereafter.  Pizzala described Walsh's death as follows:

> We walked out of the detox cell around to the back wall, and then she kind of put her hand on the wall like she was still a little unstable.  I said are you sure you're all right?  And I know if you're claustrophobic, the last thing you want to do is go back into the tank.  So she wanted to go back . . . so we opened the female max cell, opened it up, and I stood in the doorway just to make sure that she was going to make it to her bed all right.  And she went straight over to the wall and slid down the wall, and that was it.

*Ibid.*  Pizzala then called for the paramedics, who took Walsh to the local emergency room.  She died at 1:05 p.m. from an "upper mediastinal tumor encircling her aortic arch, trachea and esophagus." Def.s' Mot. Summ. J. Ex. Q, Autopsy Report.

The plaintiffs submitted the reports of three experts.  Valerie Tenneson, a registered nurse, claims that nurse McCormack was deliberately indifferent to the medical needs of Walsh by failing to have her evaluated by appropriate medical professionals between November 17, 2004 and Walsh's death.  Werner Spitz, M.D., a pathologist, believes that Walsh died of suffocation and would have had a ninety percent chance of living at least five years had Walsh been treated in the appropriate manner.  Finally, Franklin Danziger M.D. opined that Walsh's breathing problems would have been stabilized if she had been given a tracheotomy; and had doctors removed the tumor, Danziger estimates her prognosis would have been very good.

On February 24, 2005, the plaintiffs, Pamela Jean Forton and Linwood Eugene Munsell, personal representatives of Walsh's estate, filed suit against Ogemaw County, McCormack, and several corrections officers alleging under 42 U.S.C. § 1983 that they were deliberately indifferent

-12-

to Walsh's serious medical needs in violation of the Eighth Amendment.  Through various stipulations, many defendants have been dismissed from the suit.  Remaining are Bonnie McCormack, corrections officers Brian Gilbert, Vincent Tomassi, and Steven Pizzala.  Gary Cowdrey, Ogemaw County jail administrator, also remains as a defendant.  On February 17, 2006, defendant McCormack moved for summary judgment.  The corrections officer defendants and Cowdrey followed form on February 28, 2006.  The plaintiffs have filed a response in opposition, and the Court heard oral argument on May 16, 2006, after which the motions were taken under advisement.

## II.

A motion for summary judgment under Federal Rule of Civil Procedure 56 presumes the absence of a genuine issue of material fact for trial.  The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotes omitted).

A fact is "material" if its resolution affects the outcome of the lawsuit.  *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001).  "Materiality" is determined by the substantive law claim.  *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000).  An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics*

& *Space Admin.*, 14 F.3d 1143, 1148  (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Ctr. v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Thus a factual dispute that "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment that is properly supported.  *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir. 1993); *see also Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir. 1999).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts.  *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002).  The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).  A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper.  *Celotex Corp.*, 477 U.S. at 322-23.

The party who bears the burden of proof must present a jury question as to each element of the claim.  *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000).  Failure to prove an essential

element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991). It must be emphasized, however, that "[i]n evaluating the evidence, [the court] 'draw[s] all reasonable inferences therefrom in a light most favorable to the non-moving party.'" *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

The Supreme Court has held that the Eighth Amendment imposes upon prison officials the duty to "provide humane conditions of confinement," and that among the obligations attendant to the discharge of that duty is to "ensure that inmates receive adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). This obligation, however, is not unqualified. To the contrary, it is tightly circumscribed by rules requiring certain levels of proof when a prisoner argues that his conditions of confinement have crossed the boundary established by "contemporary standards of decency" incorporated into Eighth Amendment jurisprudence. *See Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (observing that "the Eighth Amendment 'must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.'" (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion))). Thus, although under the Eighth Amendment, prisoners have a limited constitutional right to proper medical care, *Estelle v. Gamble*, 429 U.S. 97, 103 (1976), that right is violated only when corrections officials are deliberately indifferent to the prisoner's serious medical needs. *Id.* at 104.

A claim that the Eighth Amendment has been violated by a prison official's deliberate indifference to a prisoner's adequate medical care requires proof of both an objective and a subjective component. To satisfy the objective component, the plaintiff must allege that the medical need asserted is "sufficiently serious." *Farmer*, 511 U.S. at 834. "To satisfy the subjective

-15-

component, the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837). The defendants in this case each argue that the plaintiffs have failed in their proof on both components of their Eighth Amendment claim.

A.

The argument that the plaintiffs have not established the objective component of the claim is untenable. The Sixth Circuit has explained that proof of that element "requires only that 'the inmate show that he is incarcerated under conditions posing a substantial risk of serious harm' . . . so as to avoid 'the unnecessary and wanton infliction of pain.'" *Blackmore v. Kalamazoo County*, 390 F.3d 890, 896 (6th Cir. 2005) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Proof of this element need not be unduly rigorous: a plaintiff can satisfy her burden by showing that the medical condition is so obvious that a lay person would recognize the need for prompt treatment, or, for more subtle conditions, by submitting verifying medical evidence of the condition. *Id.* at 897-98. To emphasize, "[a] sufficiently serious medical need is predicated upon the inmate demonstrating that he or she is incarcerated under conditions imposing a substantial risk of serious harm." *Miller v. Calhoun County*, 408 F.3d 803, 812 (6th Cir. 2005) (internal quotes and citation omitted).

The undisputed facts in this case demonstrate that Walsh suffered from a cancerous tumor that encircled her vital organs "like a great fist surrounding [her] trachea and great vessels of the heart, slowly choking it." Dep. of Dr. James Hall at 14. That fact was well documented by the autopsy report and the deposition testimony of Dr. Hall, the medical examiner. One cannot imagine a more serious condition or one that could result in greater harm, since Walsh's medical condition

-16-

actually killed her.  The Court finds that the plaintiffs have satisfied the objective component of their claim.

B.

Proof of the subjective component is more problematic for the plaintiffs.  As the Sixth Circuit has explained:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at 812 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  The court explained in two recent cases that to establish deliberate indifference, the plaintiff must show that a prison official knew of and disregarded a substantial risk of serious harm to the inmate.  In *Miller*, the court explained:

> Deliberate indifference requires a degree of culpability greater than mere negligence, but less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.  The prison official's state of mind must evince deliberateness tantamount to intent to punish.  Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference.  Thus, an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Id.* at 813 (internal citations omitted).

In *Carter v. City of Detroit*, 408 F.3d 305 (6th Cir. 2005), the court elaborated further:

> Deliberate indifference is not mere negligence. Deliberate indifference requires that the defendants knew of and disregarded a substantial risk of serious harm to [the detainee's] health and safety. This standard is subjective. It is not enough that there was a danger of which an officer should objectively have been aware. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." If an

-17-

officer fails to act in the face of an obvious risk of which he should have known but did not, the officer has not violated the Eighth or Fourteenth Amendments.

*Id.* at 312 (quoting *Watkins v. City of Battle Creek*, 273 F.3d 682 (6th Cir. 2002)); *see also Comstock*, 273 F.3d at 703.

The plaintiff can avoid summary judgment by demonstrating that the defendants had a sufficiently culpable state of mind (i.e., the subjective component) "based on a strong showing on the objective component." *Carter*, 408 F.3d at 313. However, in such cases, the objective condition and the consequences of delayed or denied medical treatment must be obvious to the common observer. For instance, in *Garretson v. City of Madison Heights*, 407 F.3d 789 (6th Cir. 2005), the court found deliberate indifference on the part of city police officers who were told by an in-custody plaintiff that she was a diabetic and needed insulin, but refused treatment in the face of that obvious medical need. In *Carter*, deliberate indifference was found when a jailor ignored an inmate's complaints of chest pain and shortness of breath and her statements that she had not taken her heart medication. The evidence that the defendant disregarded the classic symptoms of a heart attack and the plaintiff's cries that she needed to go to a hospital was sufficient to support an inference that satisfied the subjective component. *Carter*, 408 F.3d at 312. In *Clark-Murphy v. Foreback*, 439 F.3d 280 (6th Cir. 2006), the defendants ignored the decedent's symptoms of mental illness and dehydration and instead allowed him to "languish[] in his cell for five days without the door being opened and apparently with the officers unable readily to see into his cell for part of the time." *Id.* at 289. The inmate died of dehydration, and the court found that the evidence presented a fact issue for trial "given the [defendants'] repeated interaction with [the decedent] and repeated opportunities to assess the seriousness of the situation." *Id.* at 290.

-18-

On the other hand, the Sixth Circuit has found evidence of deliberate indifference wanting in *Miller v. Calhoun County* where the inmate died of a brain tumor, which apparently manifested itself by a headache on a Friday evening and resulted in death the following Sunday afternoon. The inmate's symptoms became progressively worse, and at one point on Saturday he was found "lying face-up on the floor of his cell in a puddle of water." *Miller*, 408 F.3d at 809. The jail guards notified the prison doctor by telephone and moved the inmate to the intake area for observation. The doctor told them she would examine the inmate the next day. Through the night, the inmate was seen rolling on the floor of the observation cell and appeared to have had a "possible seizure," but later he said he thought his blood sugar was low and requested a candy bar. On Sunday morning, the inmate was unresponsive, and an ambulance was called to take him to a hospital where he was diagnosed with a massive intracranial hemorrhage and ultimately expired later that day. The court affirmed the district court's summary judgment for all defendants, concluding that the prison doctor never became fully aware of the extent of the risk to the inmate, and the guards lacked actual knowledge of the inmate's true health status. Although certainly there was evidence that the inmate suffered from a medical condition, the guards took some action and did not ignore the inmate entirely. The court emphasized "that '[k]nowledge of the asserted serious needs or of the circumstances clearly indicating the existence of such needs[] is essential to a finding of deliberate indifference.'" *Id.* at 821 (quoting *Blackmore*, 390 F.3d at 396). Deliberate indifference could not be proved where there was no evidence that the guards knew how serious the inmate's condition actually was.

Similarly, in *Watkins v. City of Battle Creek*, the defendant police officers were faced with an inmate who exhibited signs of illness from drug ingestion following his arrest but denied

-19-

swallowing any drugs.  The officers explained to Watkins that he could die if he had ingested drugs, they would take him to the hospital if he had, and assured him that no additional charges would be levied for telling them about drugs he might have swallowed.  Watkins denied that he had swallowed drugs and declined medical attention.  At approximately 3:30 a.m., Watkins was brought to the receiving area of the jail where he complained of a stomach ache and appeared to others to be drunk or high.  A few minutes later, he fell from a chair and made some chewing motions with his mouth. Officers that were present at the jail and who had been with Watkins when he was questioned about drugs again asked Watkins whether he had swallowed drugs or alcohol.  He again was assured that he would be given medical treatment and would not additionally be charged.  As before, Watkins denied swallowing drugs and attributed his problems to smoking marijuana and consuming alcohol. When officers began to escort the plaintiff to his cell, he grabbed his stomach and bent over as if to vomit.  He fell before he was taken to an observation cell.  Some five minutes later, Watkins, then in an observation cell through which he could be seen from the intake room, told an officer that had processed his intake that he felt sick.  Apparently, the officer offered to check on him every few minutes and wake him if he was asleep.  That officer never returned, and other officers observed Watkins "sitting in the cell at 4:15 a.m., standing in the back of the cell at 4:45 a.m., moving about the cell at 5:00 a.m., and standing at the glass door looking out at 5:05 a.m." *Watkins*, 273 F.3d at 684.  Following a routine head count at approximately 5:30 a.m., officers found Watkins not breathing in the cell.  They unsuccessfully attempted to resuscitate him, and emergency personnel pronounced him dead at 5:56 a.m.

The court of appeals affirmed the summary judgment on the deliberate indifference claim brought by Watkins's survivors.  The court explained:

-20-

> [I]t is not enough for plaintiff to demonstrate a question of fact whether the police officers or sheriff's deputies should have known that Watkins had swallowed drugs. We find the evidence was not sufficient to lead a rational trier of fact to conclude that the officers or jailers knew Watkins needed medical attention for swallowing drugs. . . .  While the one deputy who said he would check on Watkins failed to do so, Watkins was nonetheless kept under observation and his movements were noted by other officers. This case does not involve an incapacitated detainee or one who asked for but was refused medical treatment. Plaintiff faults defendants for not forcing medical treatment on Watkins in the face of his repeated denials and plausible explanations. We find that this is insufficient to establish a question of fact on the issue of deliberate indifference.

*Id.* at 686.

These cases provide guidance with respect to the plaintiffs' claims in this case.  Because a finding of deliberate indifference requires an examination of the subjective state of mind of a particular defendant, the Court will examine the evidence with respect to each individual defendant that remains in the lawsuit.

### 1.

The plaintiffs' main complaint against McCormack is that she should have gotten physician assistant MacAuley involved in Walsh's treatment between November 17, 2004 and November 20, 2004 when Walsh died, or McCormack should have taken Walsh to the hospital.  The plaintiffs state that the evidence establishes that McCormack knew the following: (1) Walsh had complained about pain in her neck and was taking Visteral, Seriquil, and Paxil; (2) Walsh requested medical attention because of her neck on November 8, 2004; (3) Walsh was sent to the Evergreen Clinic on November 11, 2004; (4) a CT scan was ordered to diagnose the neck condition on November 23, 2004 and Vicodin was prescribed; (5) a second trip to the Evergreen Clinic on November 16, 2004 revealed worsening pain and a mass on Walsh's neck approximately five centimeters by five centimeters in length; and (6) Walsh complained of difficulties breathing on November 17, 18, and 20 of which

-21-

McCormack was apprised.  Finally, the plaintiffs argue that McCormack told corrections officer Tomassi that Walsh was to be taken to the hospital if she turned blue or passed out, and McCormack's initial denial of that statement somehow justifies an inference that McCormack was indifferent to Walsh's medical needs.

This evidence, when viewed most favorably to the plaintiffs, does not establish deliberate indifference by McCormack.  It is true that McCormack was aware that Walsh was taking Visteral, Seriquil, and Paxil, as noted above.  However, there is no evidence in the record to suggest that these drugs relate either to Walsh's neck problem or her difficulty breathing.  Walsh further was examined on November 11, 2004 by MacAuley and Dr. Beasley at McCormack's behest after McCormack personally examined Walsh's neck.  Dr. Beasly ultimately concluded that the neck swelling was non-emergent and ordered a CT examination for November 23, 2004.  On November 16, 2004, Walsh was diagnosed with and treated for an upper respiratory infection at the Evergreen Clinic. It was this diagnosis that drove McCormack's and the jail guards' responses to Walsh's symptoms.

When Walsh complained of difficulty breathing on November 16, 2004. McCormack prudently asked to speak with her.  It is undisputed that McCormack took no further action because Walsh "sounded fine . . . was breathing fine.  She had a conversation with me" for a few minutes. McCormack dep. at 42.  When Walsh complained the following day of shortness of breath and feeling claustrophobic, McCormack personally checked on her and administered the inhaler medication, an apparently reasonable treatment for an upper respiratory infection.  McCormack "sat with patient in observation, instructed her on use of the Albuterol." *Id.* at 45.  Although Walsh stated that the inhaler did not help, McCormack's notes suggest that she was using the inhaler incorrectly. In addition, the plaintiff's complaints came less than two days after the upper respiratory infection

-22-

diagnosis.  Further, Walsh told McCormack that the swelling on her neck was smaller, which McCormack confirmed by personal observation.

Although the record contains evidence that an inmate called Walsh's friend and spoke to Walsh's boyfriend about Walsh's neck swelling and difficulty breathing, and the friend attempted to contact the jail administrator, the plaintiffs do not point to evidence suggesting that McCormack knew of these specific complaints and failed to act on them.  The same holds true for Shaw's observations before November 20, 2004.  In fact, it is difficult to correlate Shaw's testimony to specific dates, and there is no evidence that the substance of those observations was communicated to McCormack.

McCormack heard one final complaint before Walsh's death on November 20, 2004: at approximately 5:00 a.m., Tomassi contacted McCormack and told her that Walsh was complaining of shortness of breath.  McCormack told Tomassi to give Walsh her inhaler and move Walsh to the observation/detox cell, which Tomassi did.  McCormack stated that she assumed she would be alerted if Walsh's condition deteriorated.

The plaintiffs make much of a statement attributed to McCormack that she instructed Tomassi if Walsh "turns blue or passes out to take her to the hospital." *Id.* at 15.  Tomassi testified that he understood this statement to mean he was to take Walsh to the hospital if her condition deteriorated. *Id.* at 42.  It is unclear how such an instruction evinces deliberate indifference; in fact, it is consistent with McCormack's apparent understanding that Walsh suffered from an upper respiratory infection that could escalate into more serious symptoms.

The plaintiffs rely on the testimony of their expert, nurse Tenneson, who opined that McCormack was deliberately indifferent because she did not contact MacAuley or order Walsh

-23-

transported to the hospital. However, there is no evidence that Tenneson is aware of the legal notion of deliberate indifference within the meaning of Eighth Amendment jurisprudence. Rather, Tenneson's conclusion is nothing more than an opinion that McCormack was negligent by failing to adhere to a standard of care.

It was McCormack who organized the medical care for Walsh. McCormack saw to it that Walsh was seen twice at the Evergreen Clinic. Dr. Beasly did not detect the tumor or comment on Walsh's breathing. When Walsh complained of breathing problems, McCormack made sure that Walsh was able to converse on the phone and later personally demonstrated how to use the inhaler. McCormack moved Walsh into the observation cell for closer scrutiny. McCormack suggested another response on the date Walsh died when she told Tomassi to move Walsh into the observation cell and administer Walsh medication, and said that Walsh should be taken to the hospital if she passed out or turned blue. Certainly, more could have been done for Walsh, and perhaps McCormack did not act reasonably in the circumstances. But negligence in the air is not the equivalent of deliberate indifference. There is no evidence to suggest that McCormack's conduct was "tantamount to intent to punish" *Miller*, 408 F.3d at 813. Even McComack's "failure to alleviate a significant risk that [s]he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Ibid.* McCormack is entitled to summary judgment on the plaintiffs' Eighth Amendment claim.

2.

The plaintiffs argue that defendant Tomassi was deliberately indifferent to Walsh's medical needs by: (1) failing to inform McCormack concerning all of Walsh's medical problems; (2) failing to inform McCormack that Walsh requested to go to the hospital; (3) throwing a paper bag in Ms.

-24-

Walsh's cell and telling her to breath in that and not to bother him unless it was a life and death situation; and (4) indicating on the jail logs that McCormack advised to take Ms. Walsh to the hospital if she turned blue or passed out. However, Tomassi actually sought medical advice from McCormack on November 20. Further, he testified that he checked on Walsh frequently after he administered her medication and inhaler. That fact remains undisputed. He also testified that Walsh seemed "a little better" but was "just breathing kind of heavy" to begin with anyway.

Shaw stated that she and Walsh asked that Walsh be taken to the hospital before Tomassi contacted McCormack. However, McCormack stated that Walsh should be taken to the observation cell and taken to the hospital if Walsh turned blue or passed out. Tomassi appears to have complied with McCormack's directions. The Sixth Circuit has reasoned that where an officer calls for "medical assistance when a detainee appears ill does not smack of indifference toward that person's well being." *Linden v. Washtenaw County,* 167 Fed. Appx. 410, 421 (6th Cir. 2006) (unpublished). In this case, there is no evidence that Tomassi ignored the plaintiff; rather, the undisputed facts show that he responded to Walsh's complaint, gave her the prescribed inhaler (even according to Shaw), and stayed in contact with McCormack. There is no evidence that Tomassi was aware of the risk posed by the malignant tumor; his response did not betray deliberate indifference to an upper respiratory ailment, which was the working diagnosis at the time. As a consequence, the Court must find that the plaintiffs have failed to offer sufficient evidence to create a jury question as to this defendant.

3.

The plaintiffs' theory of liability against defendant Cowdrey appears to be based on his failure to respond to Shirley Butson's telephone call expressing concern for Tracy Walsh. The

-25-

parties concede that Cowdrey was not present in the jail on the date Walsh died.  The plaintiffs included a failure to train claim against him in the complaint, but that claim was dismissed by stipulation earlier in this litigation.  Apparently, the plaintiffs believe the fact that Butson left a message on the Cowdrey's work answering machine on November 19, 2004 concerning Walsh's condition and the confusion over whether he told McCormack of Butson's concern for Walsh's health is proof that he was deliberately indifferent.  However, there is no evidence that Cowdrey knew how serious Walsh's problem was; indeed, even the medical personnel did not appreciate the gravity of her condition.  As a result, Cowdrey likely did not act with an intent to punish, even if he should have perceived that Walsh had a serious medical need.  He likewise is entitled to summary judgment on the Eighth Amendment claim.

4.

The plaintiffs allege that defendants Gilbert and Pizzala heard Walsh complain about breathing difficulty and screaming that she wanted to go to the hospital while she was in the observation cell, but they failed to do anything in response to her cries.  The evidence shows that Pizzala was briefed by Tomassi about Walsh's condition and why she was in observation cell.  When he arrived on his shift at 6:00 a.m., Pizzala heard Walsh screaming that she was dying.  He testified that he checked on Walsh after he spoke to Tomassi not long after he arrived.  Walsh apparently told Pizzala that she wanted to return to her cell.  Pizzala stated that he remembered trying to calm Walsh and told her she needed to relax.  This evidence is undisputed.

At 8:00 a.m., corrections officer Gilbert arrived for his shift and took the lead in dealing with Walsh, while Pizzala monitored Walsh on the closed-circuit television.  Pizzala briefed Gilbert about Walsh, and Gilbert spoke to Walsh around 8:40 a.m.  According to Gilbert, Walsh reported that she

-26-

was breathing just fine and wanted to return to her cell.  Walsh began to yell again at 9:10 a.m., but the substance of her screaming appears unknown.  Gilbert checked in with Walsh at 10:15 a.m. and informed Walsh if she calmed down (Walsh was rocking back and forth), she could go back to her cell around lunch time.  Pizzala brought Walsh lunch and told her if she ate it, he would bring her back to her cell.  Although Walsh did not touch her lunch much, Pizzala decided to take her back to her cell when he returned for the tray and after Walsh asked again.  Pizzala noticed that Walsh appeared unsteady, and he asked if she really wanted to go to her cell.  Walsh persisted on returning. When Walsh entered her cell, she collapsed and Pizzala called emergency response.

Although these officers might have contacted McCormack, it appears they monitored Walsh frequently and tried to comply with Walsh's desires to return to her cell.  Further, Walsh screamed at times, but also reported being able to breath fine.  The facts do not establish that these officers "knew of and disregarded a substantial risk of serious harm to [Walsh's] health and safety." *Carter*, 408 F.3d at 312.  Since there is no evidence that they were deliberately indifferent to Walsh's serious medical needs, summary judgment is appropriately granted to them as well.

### III.

The facts of the case demonstrate that Tracy Walsh suffered from a rapidly growing malignant tumor, which tightened around her windpipe as it grew and slowly suffocated her.  For an inmate in a county jail, this must have been a painful, terrifying, and lonely way to die.  However, due to perhaps the carelessness of the medical providers, the delay in appropriate medical tests, or the inattentiveness of care givers who are not parties to this case, it appears that her jailors were not aware of her true condition.  The Court believes that Ms. Walsh's jailors' conduct is readily explained by their reaction to the working (mis)diagnosis under which they labored.  Had an

accurate diagnosis been made known to them, perhaps Ms. Walsh's suffering would have been diminished and her life extended, at least for a short time. But there is no evidence that the failure to respond appropriately was attributable in any way to the deliberate indifference of the defendants presently before the Court.

Accordingly, it is **ORDERED** that the defendants' motions for summary judgment [dkt # 38, 43] are **GRANTED**.

It is further **ORDERED** that the plaintiffs' complaint is **DISMISSED** with prejudice.

It is further **ORDERED** that the plaintiffs' motion to restore oral argument [dkt # 62] is **GRANTED**.

It is further **ORDERED** that the motions to compel certain discovery, for judgment on the pleadings, and the *in limine* motion [dkt # 32, 43, 60] are **DISMISSED** as moot.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: May 19, 2006

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 19, 2006.

s/Tracy A. Jacobs
TRACY A. JACOBS

---